IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DIANE DAVIS, | CIVIL DIVISION |
| Plaintiff, | Case No. 2:21-cv-103 |
| v. | |
| EXCELA HEALTH, | |
| Defendant. | |

**COMPLAINT AND JURY DEMAND**

A. *Preliminary Statement*

1. The plaintiff Diane Davis brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* to redress violations of her right to be free from employment discrimination and retaliation based upon engaging in protected activity. Because of the violations described herein, this Court is also empowered to exercise pendant jurisdiction pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* A jury trial is demanded.

B. *Jurisdiction*

2. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 2000e *et seq.*, 28 U.S.C. § 1331 and under the doctrine of pendant jurisdiction.

3. On or about September 15, 2020, the plaintiff timely filed a charge alleging discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), docketed at 533-2020-02281. This charge was simultaneously cross-filed with the Pennsylvania Human Relations Commission.

4. The EEOC issued a Notice of Right to Sue on December 21, 2020.

5. This complaint is filed within 90 days of receipt by the plaintiff of the Notice of Right to Sue.

C. *__The parties__*

6. The plaintiff Diane Davis is an adult individual who resides at 1860 Mt. Pleasant Road, Greensburg, Westmoreland County, PA 15601.

7. The defendant Excela Health ("Excela" or the "company") is an entity doing business in the Commonwealth of Pennsylvania, and, specifically, in this district. The defendant maintains a place of business at 1 Mellon Way, Latrobe, Westmoreland County, PA 15650.

8. At all times material, the defendant employed more than fifteen employees.

9. The defendant was the plaintiff's employer and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

D. *__Factual Background__*

10. The plaintiff was employed by Excela, from July 2004 through April 24, 2020, at which time the company terminated her employment. At the time of her discharge, her job title was RN Staff Nurse.

11. The plaintiff's duties as RN Staff Nurse included triaging patients, initiating protocol orders to expedite treatment and patient care.

12. At all times relevant, the plaintiff performed the functions of her job competently and efficiently and was considered to be an excellent employee.

13. The plaintiff's supervisor was Vicki Jellison, ER Manager.

14. The plaintiff was terminated from her position in retaliation for raising issues about Michele Geiger, Technical Partner, being sexually harassed at work by Craig Neely, another Technical Partner, and for expressing her concerns about the retaliation that Geiger was

being subjected to after the harassment came to light. The details regarding the underlying events, the plaintiff's efforts to have management address and resolve the problem and the ensuing retaliatory discharge follow.

15. In November 2019, the plaintiff was with Geiger at work when Tiffany Kolbosky came up to them swearing loudly and slamming things. Geiger and the plaintiff asked if Kolbosky was okay and Kolbosky burst out, "NO! I'm not okay! That fucking asshole who I've been fucking for years now thinks he can just dump me for Katie Frick [a Unit Coordinator] right under my nose!" The man that Kolbosky was referring to was Craig Neely, Technical Partner.

16. Neither the plaintiff nor Geiger talked to anyone else about Kolosky's outburst or the fact that she was in a sexual relationship with Neely that had apparently gone bad. Neely found out about Kolbosky's bombshell "disclosure" and whom she had told. Over the ensuing months, Neely, who had a history of treating female staff members with disdain, became more aggressive towards them, berating and insulting them even more frequently. In particular, he seemed to focus on Geiger, repeatedly referring to her as a "fucking bitch" and calling her "The Giraffe", a demeaning reference to her height. On one occasion, Geiger asked Neely to help her with a patient and, as she walked away, he motioned with his hands as though he was masturbating toward her.

17. Following the "masturbation gesture", Geiger complained to Jellison about how Neely was treating her. Jellison's solution was to split the two up, making Geiger stay in the back nurse's station while Neely was working. This proved to be an impractical arrangement because staff in the ER must work as a team and are always intermingling and having to work together. Jellison did not further investigate the matter and did not otherwise discipline Neely.

Neely made rude sexist comments to and about Geiger when he encountered her during their shifts, which he frequently did.

18. Geiger was growing increasingly concerned about the hostile work environment that she was going to and decided to go over Jellison's head and reach out directly to HR to try to remedy the situation.

19. On January 27, 2020, HR called for a meeting with Geiger, Neely, Jellison and Maryanne Singley, V.P. of Patient Care Services, to discuss the ongoing issues of sexual harassment. Geiger refused to attend the meeting because she felt uncomfortable being around Neely and she thought he was the one who needed to be talked to about the situation. Shortly thereafter Neely was either terminated or resigned.

20. A few days after Neely's separation of employment, Jellison posted the work schedule. She assigned Geiger to work all three shifts during the upcoming schedule, i.e., from late February through early March. Up until this point, Geiger, who was a seasoned Technical Partner with 27 years of experience in the ER, had been assigned steady daylight (i.e., the 7a to 3p shift). Further, Jellison told Geiger that she was not permitted to switch shifts with anyone. This was remarkable because nurses and technical partners were always permitted to swap shifts. It was clear that Jellison was doing this to retaliate against Geiger.

21. Geiger approached Jellison and tried to get her to change her shifts back to daylight but Jellison refused. Further, Jellison again refused to let Geiger swap shifts with other employees.

22. Geiger realized that working varying shifts was not going to be tenable, so, around March 11, 2020, she told Jellison that she was thinking of tendering her resignation.

23. The plaintiff was concerned that Geiger was being punished for turning in another co-worker for months of sexual harassment. She talked to Jellison and expressed her concern that Geiger was thinking of resigning. Jellison said that she understood the plaintiff's concern but Geiger would have to do what was good for her.

24. On or about March 13, 2020, the plaintiff logged into the company's intra-net and clicked on the "anonymous employee feedback" link and expressed her concerns about the situation. She expressed great sadness that "one of our most valued TP's was leaving as a result of being punished for turning in another staff member for sexual and verbal harassment" and that "as a female employee, I fear that I, too, could be punished if I ever had to report sexual harassment on our unit and this is unacceptable".

25. The following Monday, March 16, 2020, Jellison approached Geiger angrily. She told Geiger, "I want you to know that I was not 'punishing' you for making you work all three shifts!" Jellison also told Geiger, "EVERYBODY, and I do mean EVERYBODY got a letter through the employee feedback line stating that I am punishing you for turning in Craig!" Geiger was understandably confused because she did not know that the plaintiff had sent a message through the "anonymous employee feedback" link.

26. Later that day, Jellison approached the plaintiff and said, "Diane, I want you to know that I was NOT punishing Michele with her schedule for turning in Craig." The plaintiff asked Jellison why she was telling her this. Jellison replied, "*somebody* had written into the employee feedback line expressing that Michele was being punished. And seeing how you were concerned about her wanting to quit, I assume that it was you". The plaintiff did not deny that she was the one who sent the anonymous message. Instead, she said, "Well, it does seem like you're trying to punish her because she isn't even allowed to trade the shifts."

27. Jellison did not respond to that, but instead said, "and by the way, the compliance officers got a hold of the posts you wrote in the Trib-Live, so I have to write you up for that." She handed the plaintiff a final written warning.

28. This was related to a story printed by the Trib-Live on March 6, 2020 regarding a toddler who had been badly physically abused by his drug-addicted mother. The toddler was treated at Excela Latrobe's ER and then transferred to Children's Hospital in Pittsburgh. The plaintiff was one of the emergency room nurses working when the toddler was brought in. The plaintiff was upset by the toddler's condition and what his mother had done. She saw the Trib-Live story and posted some comments. Jellison found out about that the next day, March 7, and told the plaintiff to delete the comments because she didn't want to get the plaintiff in trouble for commenting on a story involving a patient of the hospital. The plaintiff did so immediately, so her comments were taken down within 24 hours of her having posted them. At the time, based on Jellison's informal handling of the matter, the plaintiff had believed that would be the end of it. This, of course, was all before the plaintiff's anonymous message regarding the retaliatory treatment of Geiger.

29. The plaintiff realized that, having satisfied herself that the plaintiff was the source of the anonymous message, Jellison was going to make her pay for what she had done by giving the plaintiff a final written warning regarding the Trib-Live post. Since the plaintiff was now on a "final warning", she knew that her job was in serious jeopardy.

30. On April 16, 2020, Eileen Kantorik, Employee Health RN, called the plaintiff and told her that she had been exposed to a Covid patient and to let her know if the plaintiff started experiencing any symptoms.

31. On April 17, 2020, the plaintiff went to work and was moving through the daily screening process. Katie Frick, Unit Coordinator, noted that the plaintiff had a cough, which the plaintiff attributed to her seasonal allergies. Frick told the plaintiff that she had to call Employee Health ("EH"). The plaintiff called EH and spoke to Kantorik who told her that she should go home for seven days.

32. The plaintiff immediately left work and returned home to start the seven-day quarantine. Kantorik and Jellison called her a couple of times during that morning to ask some questions and to give the plaintiff some information. At about 1:30 p.m., Kantorik called the plaintiff again and said that, because the plaintiff was a "front-line worker" in a "high-need" area, it would be permissible for her to return to work as long as she wore her N-95 mask all day for one week.

33. The plaintiff's next scheduled shift was Sunday, April 19, 7a-7p. The plaintiff noticed that, on Saturday night, the scheduling coordinator posted on the ER Group-Me app, that the plaintiff's shift needed to be filled. The plaintiff messaged the coordinator and advised her that there was no need to fill the shift because she was going to report to work. The coordinator asked if Jellison and EH had cleared her for work. The plaintiff called the unit and talked to one of the RNs on duty advising her that Kantorik had cleared the plaintiff to return.

34. The plaintiff worked the Sunday shift as well as the 11a-11p shift on Monday and was never questioned by Jellison (who was working the Monday shift as well) or anyone else. In fact, Jellison saw the plaintiff during the Monday shift and asked her how she was feeling. The plaintiff responded that she felt fine and reiterated that she just had allergies. The plaintiff wore the N-95 mask as instructed.

35. When the plaintiff was getting ready for her third shift on April 23, she got a call from another EH nurse. She said, "hey Diane, we're calling to see how you are so we can get you back to work". The plaintiff advised that she was already back to work as authorized by Kantorik. Several minutes later, Kantorik called and said, "Diane, I never told you to go to work." The plaintiff said, "What are you talking about? You most certainly did!" Kantorik again denied it and instructed the plaintiff to stay at home until she talked to Jellison and HR.

36. On April 24, 2020, the plaintiff was contacted by Vickie Maley, HR representative, and Jellsion. Jellison told the plaintiff that she was being terminated immediately because she came to work when she was told not to. The plaintiff wanted to discuss the situation and explain what had happened, but Jellison and Vickie refused to listen to her.

37. The plaintiff was terminated in retaliation for raising issues about Geiger being sexually harassed at work and for expressing her concerns about the retaliation that Geiger was being subjected to after the harassment came to light. Any other reason proffered by Excela was nothing more than a pretext.

## FIRST CAUSE OF ACTION

38. The preceding paragraphs are incorporated herein by reference as if they were set forth at length.

39. The plaintiff is female and thus is protected against harassment and discrimination on the basis of her gender under Title VII.

40. The plaintiff was qualified for her position.

41. Despite her qualifications, the plaintiff was discharged.

42. The defendant's harassment and discharge of the plaintiff were in violation of Title VII because it was based upon her gender.

43. The company retaliated against the plaintiff for engaging in protected activity, as detailed above.

44. The defendant's violations of Title VII were committed with intentional or reckless disregard for the plaintiff's federally protected rights.

## SECOND CAUSE OF ACTION

45. The preceding paragraphs are incorporated herein by reference as if they were fully set forth herein.

46. As a direct and proximate cause of its actions, detailed above, the defendant has violated the plaintiff's right to be free from discrimination and retaliation under the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951 *et seq.*

47. The defendant's violations of the PHRA were committed with intentional or reckless disregard for the plaintiff's protected rights under the PHRA.

WHEREFORE, the plaintiff respectfully requests judgment be entered in her favor and against the defendant and that the defendant be required to provide all appropriate remedies under Title VII and the PHRA, including attorney's fees and costs.

Respectfully submitted,

*/s/ Michael J. Bruzzese*
Michael J. Bruzzese
Pa. I.D. No. 63306
2315 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219
(412) 281-8676
Counsel for the plaintiff

Dated: January 25, 2021